### UNITED STATES et al. v. RODIEK.
### No. 67.

Circuit Court of Appeals, Second Circuit.

Feb. 17, 1941.

Reuben D. Silliman, of New York City (Russell C. Gay and Sherwood E. Silliman, both of New York City, of counsel), for appellant.

John T. Cahill, U. S. Atty., of New York City (Francis M. Shea, Asst. Atty. Gen., Harry LeRoy Jones and Frederick L. Smith, Attys., Department of Justice, all of Washington, D. C., George B. Schoonmaker, Asst. U. S. Atty., of New York City, and Frederick Bernays Wiener, of Providence, R. I., of counsel), for appellees.

Before SWAN, CHASE, and CLARK, Circuit Judges.

SWAN, Circuit Judge.

Purporting to act pursuant to the terms of section 9 of the Trading with the Enemy Act, as amended, 50 U.S.C.A. Appendix, § 9, the President of the United States in April 1924 allowed the claim of Johann Friedrich Hackfeld for the return of his property, or its proceeds, seized by the alien property custodian in 1918. Under this presidential order more than $3,700,000 in cash and United States bonds were paid to Hackfeld between June 7, 1924, and August 20, 1931. After Hackfeld's death the ancillary executor of his estate, appointed by the surrogate of New York county, attempted by means of a private bill introduced in the United States Senate, to obtain an additional sum representing what the custodian would have received upon sale of the seized property had it been fairly sold for what it was worth. There followed a congressional reference to the Court of Claims, 28 U.S.C.A. § 257, and a proceeding therein, which is still pending, for an advisory report. In April 1936 the present suit was filed in the court below by the United States, the then attorney general (for whom the present incumbent of that office has been substituted) and the Treasurer of the United States against the ancillary executor of Hackfeld's estate. The theory of the action is that the presidential allowance of Hackfeld's claim resulted from misrepresentations and fraud on his part and from mistakes of law and fact on the part of United States officials; that Hackfeld was not a citizen of the United States, as the President had found, but was an alien enemy; and in consequence that he never became entitled to get back more than 80% of the proceeds of the seized property, as authorized by the Settlement of War Claims Act of March 10, 1928. 45 Stat. 254, 50 U.S.C.A. Appendix, § 9 et seq. Accordingly the complaint sought recovery from the defendant of 20% of the aforesaid payments to Hackfeld, with interest thereon. After trial to a jury the district judge directed a verdict for the plaintiffs in the sum of $1,604,632.45 on the ground that Hackfeld was never a United States citizen. He found that the presidential allowance of Hackfeld's claim was made under a mistake of law and "for that reason and also because of the commencement of the proceedings in the Court of Claims," he held that the presidential allowance could be reconsidered. The dis-

trict judge did not consider whether or not the evidence in respect to the charges of fraud was sufficient to justify direction of the verdict. From the ensuing judgment the defendant has appealed.

This case presents several interesting questions of law. The first pertains to the jurisdiction of the district court; the second, to a plea of res judicata; and the third, if the merits can be reached, to Hackfeld's citizenship. But before passing to these legal questions some further statement of the facts is desirable.

Hackfeld was born in Germany in 1856. At the age of 21 he came to Hawaii and entered the service of his uncles' sugar business. He acquired a home in Honolulu, was active in local affairs, aided in the establishment of the Hawaiian Republic, and by reason of such services received from the Minister of the Interior of the Republic a certificate, dated December 21, 1894, which stated that he was "entitled, so long as he shall remain domiciled in the Republic, to all the privileges of Citizenship without thereby prejudicing his native citizenship or allegiance." This certificate, the defendant contends, constituted Hackfeld a citizen of the Republic and as such he became a citizen of the United States by virtue of the Act to provide a government for the Territory of Hawaii, which granted citizenship to all who were citizens of the Republic on August 12, 1898. 31 Stat. 141, 48 U.S.C.A. § 491 et seq.

In the year 1900 Mrs. Hackfeld's health compelled her to return to Germany. Thereafter Hackfeld spent part of his time in Germany with his wife and daughter and part in Honolulu looking after his business interests. The sugar business in which he started work had grown prodigiously; it was conducted by a Hawaiian corporation, H. Hackfeld & Co., Ltd., of which he was the president. He was in Germany when the war broke out in 1914, and he remained there until his death in 1932, except for trips to the United States on American passports in 1924, 1926 and 1929. After the United States entered the war the alien property custodian seized Hackfeld's interest in H. Hackfeld & Co., Ltd. In 1923 he filed claim, as a German citizen, for the return of $10,000, as authorized by the Winslow Act, 42 Stat. 1512, 50 U.S.C.A.Appendix, § 9(b), reserving, however, the right to establish a different citizenship. Later in the same year he filed a claim for the return of all his

seized property, alleging that he was a citizen of the United States. At the same time he applied for an American passport. After an investigation of his application the Department of State became satisfied that Hackfeld was a United States citizen; it issued him a passport on March 13, 1924. Hackfeld then came to this country and pressed his claim for the return of his property. Attorney General Stone was satisfied as to his citizenship and recommended to President Coolidge that his claim be allowed. This was done under date of April 26, 1924, and pursuant to the presidential order more than $3,700,000 was paid to Hackfeld.

In 1934, after Hackfeld's death, the ancillary executor of his estate sought to obtain an additional $3,000,000 for alleged injuries growing out of the sale by the alien property custodian of the assets of H. Hackfeld & Co., Ltd., of which Hackfeld was the principal stockholder. A private bill to authorize the payment of this sum to Hackfeld's estate was introduced in the Senate and referred to the Court of Claims for report. The ancillary executor then filed a petition in that court setting up his claims and asking for a favorable report. While this proceeding was pending the present action was begun in April 1936 in the court below, and proceeded to trial with the result already stated.

The appellant contends that under the Trading with the Enemy Act, 50 U.S.C.A. Appendix, § 1 et seq., a presidential determination is not reviewable by the courts. Section 7(c) authorized the President to determine whether or not property was enemy owned. If he determined that it was so owned and required its transfer to the alien property custodian, the presidential determination was conclusive as to the custodian's right to possession. Central Union Trust Co. v. Garvan, 254 U.S. 554, 41 S.Ct. 214, 65 L.Ed. 403. In case of mistake, the sole remedy of any claimant to obtain a return of his property was provided by section 9. Subsection (a) provides alternative methods of relief for a non-enemy claimant. He may make application to the President who "may order the payment * * * or delivery" to the claimant of the money or other property held by the custodian, or "of the interest therein to which the President shall determine said claimant is entitled"; or if the President does not so order within sixty days after the claimant's application, or if no such application was made, then the claimant may institute a suit in equity in the district court for the district in which he resides. It has recently been authoritatively decided that the United States may not attack collaterally a decree for a non-enemy claimant who proceeded by suit under section 9. Jackson v. Irving Trust Co., 61 S.Ct. 326, 85 L.Ed ——, decided January 6, 1941, affirming Sorenson v. Sutherland, 2 Cir., 109 F.2d 714. As this decision turns on the application of ordinary principles of res judicata, it is not determinative of the conclusiveness of a presidential allowance; nevertheless, it affords some aid to the appellant's contention, since the statutory language tends to support the argument that a presidential decision, when relief is sought by application to the President, is as conclusive as is a judicial decree when the alternative method of a suit in court is adopted by a claimant. Subsection (c) of section 9 permits any person whose money or other property the President is authorized to return under subsection (b) to file an application for presidential allowance or to institute a suit as provided in subsection (a), and continues: "The President or the court, as the case may be, may make the same determinations with respect to citizenship and other relevant facts that the President is authorized to make under the provisions of subsection (b) hereof." And section 12 likewise pointedly treats a presidential allowance or a judicial decree under section 9 as alternative methods of decision of equal weight and finality.

In addition to the statutory language, the appellant relies on a variety of cases holding administrative determinations not subject to judicial review. Perkins v. Lukens Steel Co., 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108; Butte, A. & P. Ry. Co. v. United States, 290 U.S. 127, 54 S.Ct. 108, 78 L.Ed. 222; Great Northern Ry. v. United States, 277 U.S. 172, 48 S.Ct. 466, 72 L.Ed. 838; United States v. Chemical Foundation, 272 U.S. 1, 47 S.Ct. 1, 71 L. Ed. 131; State of Louisiana v. McAdoo, 234 U.S. 627, 34 S.Ct. 938, 58 L.Ed. 1506; Luther v. Borden, 7 How. 1, 12 L.Ed. 581; Martin v. Mott, 12 Wheat. 19, 6 L.Ed. 537. To these may be added United States v. George S. Bush & Co., 310 U.S. 371, 60 S.Ct. 944, 84 L.Ed. 1259, and Z. & F. Assets Realization Corp. v. Hull, 61 S.Ct.

351, 85 L.Ed. ——, decided by the Supreme Court, January 6, 1941. None of these authorities, however, is precisely like the case at bar. The appellees contend that they are all inapplicable; that this case falls within the established principle that payments of public moneys made by executive officers under a mistake of law may be recovered by independent suit without the authorization of any specific statute, since administrative determinations in matters relating to the payment of public funds are never final. A statement of, this rule appears in Wisconsin Central R. R. v. United States, 164 U.S. 190, at page 205, 17 S.Ct. 45, 50, 41 L.Ed. 399 as follows: "Whatever the conclusiveness of executive acts, so far as executive departments are concerned, as a rule of administration, it has long been settled that the action of executive officers in matters of account and payment cannot be regarded as a conclusive determination, when brought in question in a court of justice." See also United States v. Wurts, 303 U.S. 414, 415, 58 S.Ct. 637, 82 L.Ed. 932; Heidt v. United States, 5 Cir., 56 F.2d 559; A.L.I.Restatement, Restitution § 46(a); Chrysler Light & P. Co. v. Belfield, 58 N.D. 33, 224 N.W. 871, 63 A.L.R. 1346. On the basis of this principle the government argues that if the President was wrong in law as to Hackfeld's citizenship, the payments made pursuant to presidential determination may be recovered by the United States in an action at law. But we are not compelled to choose between these conflicting contentions.

The government has a second string to its bow. Hackfeld's estate was not content to accept the presidential allowance as a conclusive determination of the sum to be returned to him by the United States. Assuming that the Trading with the Enemy Act declares an intention to give finality to a presidential determination which the claimant is willing to accept in satisfaction of his claims, we find nothing to indicate that it is to be conclusive upon the United States but not upon the claimant. The purpose of the assumed finality is to put the controversy at rest. If the claimant himself at a later date invited inquiry into the amount of his allowance there is no injustice in holding that he has opened up the whole matter. McElrath v. United States, 102 U.S. 426, 26 L.Ed. 189. In that case it appears that McElrath asserted a claim for back pay as an officer of the

Marine Corps, which the accounting officers of the government allowed in part. He accepted payment under protest and thereafter sued in the Court of Claims for the balance of his claim. By counterclaim the United States sought to recover the sum already paid; he resisted on the theory that the decision of the accounting officers was not reviewable. As to this Mr. Justice Harlan said, at page 441 of 102 U.S., 26 L.Ed. 189:

"Had the appellant rested upon the settlement of his account by the proper officers of the government, his right to invoke the general rule, to which we have referred, would have been entitled to more consideration than it can now receive. Upon receiving the amount awarded to him by the representatives of the government, he distinctly announced his purpose not to abide by their settlement of his accounts; but, in disregard thereof, to demand an additional sum upon the basis of full pay and allowances from June 20, 1866, to July 10, 1873.

"This suit itself invites the court to go behind that settlement, to re-examine all the questions arising out of the appellant's claim for full pay and allowances, and to correct the error which he insists was committed to his prejudice by the accounting officers of the government. The government, declining to plead the settlement of 1874 in bar of the suit, meets him upon his own chosen ground, and, insisting that its officers, misapprehending the law, paid to him out of the treasury money to which he was not legally entitled, asks, as we think it may rightfully do, judgment for the amount thus improperly paid to him."

The same principle was applied in Cummings v. Societe Suisse, 66 App.D.C. 121, 85 F.2d 287, which arose under the Trading with the Enemy Act. There the claimant had recovered an allowance pursuant to a presidential determination and later brought suit under section 9 for an additional amount. By counterclaim the alien property custodian alleged that the original allowance had been obtained fraudulently and unlawfully. The lower court struck out the counterclaim. This was reversed on appeal, the court rejecting at page 289 of 85 F.2d the theory that, even though the claimant had brought suit, the President's finding was not subject to judicial review. On appeal from judgment for the custodian after trial, the appellant contended that the government had failed

to prove a case of fraud, but the court held this unimportant, since the original allowance was granted under a mistake of law. Societe Suisse v. Cummings, 69 App.D.C. 154, 99 F.2d 387, certiorari denied Societe Suisse v. Murphy, 306 U.S. 631, 59 S.Ct. 463, 83 L.Ed. 1033.

The appellant attempts to distinguish these cases because in them the claimants brought suit and the government counterclaimed in the same proceedings, while in the case at bar the effort of the Hackfeld estate to get an additional sum was by way of private bill in the Senate and petition to the Court of Claims for an advisory report. It is contended that in such a proceeding, the United States could not file a counterclaim and should not be permitted to avoid such disability by resorting to an independent suit. The argument must be rejected. In the Societe Suisse cases there was no express statutory authority for a counterclaim by the alien property custodian, and the language of the opinions is broad enough to justify an inference that the government could have brought an independent suit. Nor do we think that the principles of the McElrath decision are limited by the technical procedure by which the claimant reopens the administrative determination. Whether he institutes a suit or applies to Congress for a gratuity, he invites reinvestigation of his claim and abandons the assumed conclusiveness of the prior allowance. Under such circumstances the United States should be at liberty not only to resist the new claim but also to question the legality of the original grant by whatever proceedings are appropriate for the purpose. Consequently it is our conclusion that whatever may be the proper construction of section 9 of the Act as to the finality of a presidential allowance which the claimant has treated as closing the controversy, the President's determination is subject to judicial review when the claimant himself seeks additional relief from the United States. Therefore the district court had jurisdiction to entertain the present action based on the theory that officers of the government had paid money out of the Treasury of the United States under a mistake of law as to Hackfeld's citizenship. See Wisconsin Central R. R. v. United States, 164 U.S. 190, 17 S.Ct. 45, 41 L.Ed. 399.

Another point requires consideration before we can reach the question of Hackfeld's citizenship. In 1934 the commissioner of internal revenue determined a deficiency of estate taxes against Hackfeld's estate, from which his ancillary executor appealed to the Board of Tax Appeals. In his petition to the Board, it was alleged that Hackfeld was a citizen of the United States and this was admitted by the commissioner "for the purpose of this proceeding alone." The Board's decision, 33 B.T.A. 1020, was affirmed by this court in Rodiek v. Helvering, 2 Cir., 87 F.2d 328. The appellant contends that this tax litigation is res judicata in the present action on the issue of citizenship.

Whether a party to litigation can avoid the application of the doctrine of res judicata by limiting his admission of a material issue "for the purposes of" the particular suit, may well be doubted; but we need not, and do not, decide. The principle of res judicata does not apply to points which come under consideration only collaterally or incidentally. Norton v. Larney, 266 U.S. 511, 517, 45 S.Ct. 145, 69 L.Ed. 413; Landon v. Clark, 2 Cir., 221 F. 841; House v. Lockwood, 137 N. Y. 259, 267, 33 N.E. 595. In the tax litigation in question, the issue before the Board, and before this court on appeal, was not Hackfeld's citizenship but his residence. The Board held that he was resident in Germany at the time of his death, and recognized, 33 B.T.A. at page 1032, that his citizenship was not a material issue. Hence the commissioner's admission (though treated as unqualified) of United States citizenship cannot be res judicata of that question. We are therefore free to consider it.

The Organic Act of the Hawaiian Territory, 31 Stat. 141, 8 U.S.C.A. § 4, 48 U.S.C.A. § 494, provides that: "All persons who were citizens of the Republic of Hawaii on August 12, 1898, are declared to be citizens of the United States." When Congress provides for collective naturalization of the citizens of annexed territory it is to the laws of that territory that one must look to determine who are citizens. Boyd v. Nebraska ex rel. Thayer, 143 U. S. 135, 12 S.Ct. 375, 36 L.Ed. 103. The question then is whether Hackfeld was a citizen of the Republic by its laws on August 12, 1898. The certificate upon which the appellant relies to prove Hackfeld's Hawaiian citizenship was issued in December 1894 after the adoption of the Constitution of the Republic of Hawaii on

July 4, 1894. Any claim that citizenship resulted from the issuance of such certificate must find warrant in that Constitution, or at least must not be negatived by its very terms.

Section 1 of Article 17 of the Constitution provides: "All persons born or naturalized in the Hawaiian Islands, and subject to the jurisdiction of the Republic, are citizens thereof." As Hackfeld was concededly not native-born, the claim must be that he became a naturalized citizen by virtue of the certificate issued to him by the Minister of the Interior. Section 2 of Article 17 authorizes the issuance by the Minister of the Interior of certificates such as Hackfeld received; and section 5 provides that "any person to whom such certificate shall be granted shall be admitted, upon application, to naturalization without showing any further qualifications." Article 18 deals with naturalization. By section 1 it is provided that the naturalization of aliens shall be exclusively within the jurisdiction of the Justices of the Supreme Court and that the procedure shall be such as may be provided by law. Section 2 sets out the conditions upon which an alien may be admitted to citizenship, and among them (No. 9) is the requirement that he shall have taken "an oath abjuring allegiance to the Government of his native land," and (No. 10) that he shall make written application, verified by oath, to a Justice of the Supreme Court, setting forth his possession of and compliance with "all of the foregoing qualifications and requirements," and shall prove them to the satisfaction of such Justice. An Act to prescribe the procedure in proceedings for naturalization of aliens was passed by the legislature of the Republic of Hawaii on June 15, 1896. Act 77. Section 1 thereof declares that an alien may be admitted to become a citizen "in the following manner and not otherwise." He is required to file a petition in writing verified by oath with a Justice of the Supreme Court. Other sections set forth what the petition shall contain, how its allegations shall be proved, and how a certificate of naturalization shall be issued and a copy thereof preserved in the records of the Supreme Court. Finally, section 9 deals expressly with a petitioner who possesses a certificate issued by the Minister of the Interior pursuant to section 2 of Article 17 of the Constitution.

 The foregoing references to constitutional and statutory provisions make it clear beyond doubt, in our opinion, that the possession of a certificate such as Hackfeld had, does not of itself make the possessor thereof a naturalized citizen but merely facilitates for him the process of naturalization. It is still necessary for him to obtain naturalization from the Supreme Court and to take an oath abjuring allegiance to any other sovereignty. The record discloses that five holders of certificates in every respect similar to Hackfeld's, applied to the court and were naturalized by its orders. The testimony of five distinguished members of the Hawaiian bar accords with our interpretation of the Hawaiian law. State Department rulings such as the Pfotenhauer case, if contrary to our conclusion can not be deemed controlling in view of the plain provisions of the Hawaiian Constitution. Nor can principles of naturalization applicable in Hawaii prior to the adoption of the Constitution of 1894 be of weight when contrary to the terms of that instrument. We are satisfied that Hackfeld was not a naturalized citizen of the Republic on August 12, 1898; consequently he did not acquire United States citizenship by virtue of the Organic Act of 1900.

This conclusion makes unnecessary any consideration of the evidence as to the allegations of fraud in procuring the presidential order under which payments were made to him. Since he was not a nonenemy, as defined by the Trading with the Enemy Act, section 2, 50 U.S.C.A. Appendix, § 2, he was not authorized to obtain a return of his seized property under section 9(a). For reasons already stated the presidential order was subject to judicial review, and the district court correctly ruled that the payments were made under a mistake of law.

Judgment affirmed.